## McFALL v. McFALL.

1. FINDINGS OF FACT by the Circuit Judge in an equity cause from written testimony reported to him, approved.
2. PLEADINGS—DUAL CHARACTER.—In action for the settlement of an intestate's estate in which the plaintiff is interested individually, and also as administrator of a deceased distributee, he should allege his dual character in the complaint, and not make himself as administrator a defendant to the action.
3. EXCEPTION not pressed in argument, overruled.
4. ADDITIONAL GROUND—LUNACY—CONTINUANCE OF TENANCY.—The Circuit Judge, after finding a lessor to have been of contractual capacity, held that even if she were *non compos mentis*, the tenancy which had existed from year to year for many years would not have been thereby terminated without a judicial declaration of her mental incapacity. *Held*, no ground for reversal.
5. ACCOUNTING BY TRUSTEE.—Where a son takes possession of his mother's estate under agreement to support her and her daughter during her life-time, he is liable to account after his mother's death for all personal property of his mother which passed into his possession, excepting such animals as died and such property as was disposed of by the mother.
6. IBID.—STATUTE OF LIMITATIONS.—In such case, the statute of limitations is no bar to the accounting.

Before NORTON, J., Anderson, December, 1890.

This was an action by John McFall and James T. McFall against Mary C. McFall, Sarah McFall, in her own right and as executrix, and others, commenced October 4, 1888. It was heard by the Circuit Judge on testimony reported to the court by the master without any findings. The opinion states the case.

*Mr. J. E. Breazeale,* for plaintiffs.

*Mr. J. L. Tribble,* for Mrs. Sarah McFall, executrix.

March 23, 1892.　The opinion of the court was delivered by

Mr. Justice Pope.　A. N. McFall, of Anderson County, departed this life in the year 1860, survived by his widow, Rachel McFall, his three sons, James T., John. and William A., and his daughter, Mary C., and Margaret Thornly, as his heirs at law, next of kin, and distributees.　When he died, he left a handsome estate, consisting of a plantation whereon he resided, known as "High Shoals," of 720 acres, about 60 slaves, and other personal property.　His widow, Rachel McFall, and his eldest son, John McFall, assumed the management of his estate as administratrix and administrator respectively.　As was unfortunately the case with most wealthy men about that time, the intestate was considerably indebted to others, both as principal and as surety. The war followed too soon after his death to enable his personal representatives to pay such indebtedness, until the emancipation of the slaves deprived them of the power, without the sale of the "home," which to all loyal hearted people is most distasteful. Some progress was, of course, made in this direction.　In 1866 or 1867, the children made some arrangement with their mother by which she received a deed for their interest in the land upon her undertaking to discharge this indebtedness, which then was some $2,500 or $3,500.

Rachel McFall was thrifty, industrious, and quite intelligent. In 1869 age was beginning to tell upon her, so that no longer could she make that headway in the management of out-door or plantation affairs as she did when she was younger.　Besides, the change in the system of labor as the result of the emancipation of slaves, was too new and unexpected for her to adapt herself to it, so that in the year last mentioned she needed the strong arms, resolution and capacity, and stirring energy of a young man. Hence she called to her aid her son, James T. McFall, to whom she confided the control of the plantation and mills, upon the agreement that, after providing for the wants and maintenance of herself and unmarried daughter, Mary, who always lived with her, he should have all he could make.　At the end of 1870, this son notified her that he could continue the arrangement no long-

er.    Hence we find her, near the close of that year, going to
Abbeville County, where her youngest son, William A. McFall,
resided with his family, to obtain his services in the management
of her business interests, and, as it proved, to smooth her declin-
ing years by an affectionate, tender, and respectful care for her-
self and daughter.    Her own plantation was in a bad plight, her
mills no longer of much value, and her stock animals old and
well worn.    In 1871, William A. McFall brought his best ener-
gies to the work confided to him.    Lands were cleared, mills were
repaired, and fresh work animals secured.    One of the results of
these labors was that the wants of the family were all cared for.
William A. McFall bought lands for himself near by and the
crops here grown largely assisted him in these labors, by which
not only was a happy home secured to his mother and sister, but
a hospitality was there dispensed which was enjoyed by the other
brothers, their wives, their children with their husbands and
friends, without stint.

All would have gone on well but for the debts of the estate of
A. N. McFall, deceased.    Some creditors were impatient, sued,
obtained judgments, and *thrice* levied upon the homestead.    For-
tunately, William A. McFall secured money from his guardian-
ship of his sons, and in 1877, having married a lady of means,
he procured the loan of money by his wife to rid the mother of
these embarrassments.    There is no doubt that this second wife,
Mrs. Sarah McFall, while she was willing to lend her money,
was a prudent business woman, and she insisted upon what ought
to be done in all families when business is had between its differ-
ent members—she insisted that notes should be given and kept
renewed ; in other words, business was business even as between
mother and son, and mother and daughter-in-law.    Her wisdom
was abundantly rewarded as well as justified by subsequent events
in this same happy family.    Mrs. Rachel McFall seemed con-
scious that her indebtedness to her son was becoming large, and
she proposed to convey her lands to him.    This he declined.
There seemed to be two reasons for his declining such proposi-
tion ; one that his brothers and sister might think strange or
hard of it ; another was that he had some hope that the mill site
might be sold at some time for such an advantageous price as to

36—35

render the sale of the other lands unnecessary. In September, 1888, Mrs. Rachel McFall died at the advanced age of about 86 years. Two months later William A. McFall also died. Between the death of the mother and son a stormy scene occurred in the family circle—James, John, and Dr. Harris on the one side, while William A., lying on what proved to be his death-bed, his sister, Mary C., and his wife, Sarah A., were on the other side. Crimination and recrimination occurred. In a few minutes a separation occurred which will. never be healed on this earth. The difficulty was as to notes held by William A. and Sarah A. McFall, signed by Rachel McFall. The result thereof is this law suit. The action was begun in the Court of Common Pleas for Anderson County on the 4th day of October, 1888, by John McFall and James T. McFall, as plaintiffs, against W. A. McFall, Mary·C. McFall, Rachel T. Seabrook, Ernest L. Thornly, and Sarah McFall, defendants. Subsequently, owing to the death of James T. McFall, his heirs at law were substituted as plaintiffs in his stead; and owing to the death of William A. McFall, the action was continued by adding as defendants in the stead of William A. McFall, his executrix and his four children. Administration having been taken out on the personal estate of Rachel McFall, deceased, by the plaintiff, John McFall, by the order of Judge Hudson, dated 29 June, 1889, the said John McFall, as such administrator, was made a party defendant.

The objects of this action were, *first*, that the estate of Rachel McFall should be administered by the court, requiring all creditors of such estate to prove their demands therein; *second*, that Sarah McFall, as executrix of W. A. McFall, be required to account for all the personal property of Rachel McFall that went into the hands of W. A. McFall while managing her property, and also for the rents and profits arising from the use and occupation of her real estate by him; *third*, that the real estate of Rachel McFall be sold for the payment of any debts due by her and afterwards for division amongst her heirs at law according to their legal rights therein respectively. The answer of the defendant, John McFall, as administrator of the estate of Rachel McFall, admits all the allegations of the amended complaint, and

alleges that the personal estate of Rachel McFall that came into his hands were $97.

Sarah McFall filed separate answers as executrix of W. A. McFall and as an individual. As executrix, she claimed that the estate of her testator was not chargeable for any personal property of Rachel McFall, and was not accountable for any rents and profits arising from the use of her real estate and personal property, because the contract of Rachel McFall and her son, William A. McFall, did not so require. On the contrary, she averred that the estate of Mrs. Rachel McFall was indebted to her testator by three sealed notes, one for $506.29 with interest, one for $2,000 with interest, one for $1,698.86, besides some taxes paid on the lands in Florida from 1885 to 1888 inclusive, and that these sums of money arose from moneys loaned by W. A. McFall to Rachel McFall to pay debts of A. N. McFall's estate, and about $1,200 to refit her mill. As an individual she set up one note for $577.43 and interest, one for $17.32, and one note for $537.60. In her answer she denies that Rachel McFall was *non compos mentis*, or was influenced by the said W. A. McFall to sign all these evidences of indebtedness. The answer of Mary C. McFall denies any allegation in the complaint imputing any undue influence exerted by W. A. McFall over her mother in all the transactions referred to; on the contrary, she avers that her mind was clear and vigorous; that W. A. McFall was induced to take charge of Rachel McFall's property by her earnest solicitation and on the same terms that James T. McFall managed it in 1870, to wit, providing for the wants of the witness and her mother, Rachel McFall, and all that should remain thereafter was to be his absolute property; and that the indebtedness set up in the answers of Sarah McFall was just and true, being money advanced by W. A. and Sarah McFall to save the home place from sale at the suit of creditors. The infant defendant answered by guardian *ad litem*.

The testimony was taken, under an order of court, by W. W. Humphreys, as master. The action was heard by Judge Norton in December, 1890, and decree filed on the 2 January, 1891. In the decree the Circuit Judge found, amongst other things, that Rachel McFall made a contract with W. A. McFall in 1871,

which was continued from that time till her death in 1888, whereby he was given control of plantation and mills, with all the earnings therefrom, upon the condition that he would pay the taxes and provide a comfortable support to herself and unmarried daughter, Mary C. McFall; that the notes held by William A. McFall and Sarah A. McFall against the estate of Rachel McFall were a just indebtedness arising from the advancement of moneys by them to pay the debts of the estate of A. N. McFall, for which Rachel McFall was responsible; that at the dates of said notes and their renewal, from 1878 to 1884 inclusive, she was not *non compos mentis;* that the transactions of William A. and Sarah McFall with Rachel McFall were not induced by the exertion of undue influence by them or either of them upon her; that the estate of William A. McFall should not account to the heirs at law or personal representatives of Rachel McFall for any rents and profits arising from her plantation or mills from 1871 to 1 January, 1889. He held, however, that the estate of William A. McFall should account to the estate of Rachel McFall for all her personal property that went into his hands on 1 January, 1871, or rather, at the time he took charge of her business. Neither party to the controversy was satisfied with this decree, and both appealed therefrom on various grounds.

We will first consider the grounds of appeal presented by the plaintiff, John McFall.

1. Because his honor erred in deciding that there were no answers put in by any of the defendants. except by Sarah McFall and those claiming through W. A. McFall, when this defendant (John McFall) filed an answer as administrator on the 21st day of August, 1889.

2. Because his honor erred in deciding that Rachel McFall was not *non compos mentis* for six years before her death, but was of sound mind and able to transact business up to her death; which finding was against the testimony of the experts sworn in the case, and against the testimony of witnesses who testified to transactions and conversations, and was based solely upon the non-expert testimony of witnesses who neither related, nor could relate, any transaction or conversation upon which to base an opinion.

3. Because his honor erred in allowing the estate of W. A. McFall three notes, when the uncontradicted testimony of three witnesses established the fact that W. A. McFall in his life-time admitted that two of said notes were incorrect.

4. Because his honor erred in deciding that the estate of W. A. McFall should not account for rents and profits of High Shoals for six years prior to the death of Mrs. Rachel McFall, or for any part of said time.

5. Because his honor erred in not sustaining the exception to the testimony of Miss M. C. McFall as to the contract between W. A. McFall and Mrs. Rachel McFall.

6. Because his honor erred in holding that John McFall, Dr. J. C. Harris, and Mrs. Annie Harris misunderstood the statement of W. A. McFall, when he admitted that portions of the claims presented by W. A. McFall were not due.

7. Because his honor erred in deciding that mere becoming *non compos mentis* by lessor, without a proceeding to have the fact declared, would not terminate a tenancy at will.

8. Because, while his honor gave the estate of W. A. McFall all that was claimed by his executrix as having been expended in payment of debts of A. N. McFall, deceased, though the amounts claimed were denied, yet he failed to allow anything on account of the payment made by James T. McFall on a judgment against the said A. N. McFall, deceased, which said payment was not denied or contested.

By an examination of the grounds of appeal just recited, it will appear that those numbered 1, 2, 3, 4, 6, and 8 relate to questions of fact. This court has so repeatedly held that it will not interfere with the findings of fact made by the Circuit Judge, unless the same are without any testimony to sustain them, or when the manifest weight of the testimony is against such findings, that it is not necessary here to repeat such decisions. Besides, after a careful examination of the testimony here adduced, we are entirely satisfied with such conclusions of the Circuit Judge. Before passing on to consider other questions, it is but proper that we should say that the first exception seems to be based upon the history given by the judge of the pleadings. He did not mean to disregard

the formal answer of the administrator, but merely to indicate that no new matter was set up in such answer. Strictly speaking, no such right as that of answer should have been allowed. All that was required in correct pleading was an allegation in the complaint reciting the dual character of that plaintiff, to wit, that he appeared in his own right and as such administrator; but all this was substantially complied with, and the inadvertence of the Circuit Judge, who allowed such an answer, wrought no substantial injury here. These grounds of appeal must be dismissed.

The fifth ground raises a point of law. Objection was raised when testimony was being taken by the master, to Miss Mary C. McFall testifying to what Mrs. Rachel McFall said when she was going to Abbeville in 1870 to see her son, W. A. McFall, but this witness immediately afterwards testified that both her mother and W. A. McFall stated in her presence what the arrangement was. No reference is made in the argument for appellant as to this ground of appeal. No reason is given this court why such testimony of Miss Mary C. McFall was not competent. And we know of none. But in the abundance of caution, we have looked into the Brief to see if any reference is there made that would assist this court. There is none there appearing. It must be dismissed.

As to the seventh ground of appeal. By reference to the decree it will be apparent that the passage excepted to is only a part, and a very immaterial part, of the judge's findings on the subject to which it refers. "She was 69 years old when he (William A. McFall) took charge of her property, and from that time during the next sixteen and two thirds years, in the course of nature and as shown by the testimony, her physical nature continued to fail until death ensued, and her mind sympathized more or less, but not so much that any disinterested person was willing to say that she was incompetent to transact business until within two years of her death, and then only Dr. Sharpe, L. T. Clinkscales in 1887, and S. B. J. McGill some time in her last days. Several other disinterested witnesses thought that she compared favorably with other ladies of her age, and I adjudge, that she had up to the time of her death sufficient capacity to will the continuance of this lease, entered into at her

solicitation when there was no suspicion of feebleness of intellect, with full knowledge of her children, after failure of another son to continue under the same contract longer than one year, and after fourteen years of faithful performance by W. A. McFall, amid family disturbances, even if such willing were necessary under our law, which it is not.    For this is a tenancy from year to year, and in order to terminate it, notice must have been given. The mere becoming *non compos mentis* by lessor, without a proceeding to have the fact declared, would not terminate it."

Thus, after the judge has announced his conclusion as to the mental capacity of Mrs. Rachel McFall to make this contract as a binding contract from 1871 till her death, he merely gives as additional reasons satisfying him as to this conclusion, that the contract created a tenancy from year to year; that such being the case, notice was necessary to terminate it; that even the fact that during that time she had become *non compos mentis*, without a legal proceeding to declare such fact, would not terminate it. We see no reason to disturb this conclusion, and it is therefore dismissed.

We have yet to consider the grounds of appeal presented by the defendant.

1. Because his honor, the presiding judge, erred in holding that the testimony as to the good character of W. A. McFall, deceased, was inadmissible in this case and overruling the same, whereas he should have held the same was admissible, under the charge that Rachel McFall was *non compos mentis*, and that W. A. McFall had taken advantage of her condition to obtain the notes in controversy.

2. Because his honor erred in holding W. A. McFall's estate liable to account for the property of Rachel McFall in 1871, when the testimony shows that all the property she then had was taken in hand by her administrator, except the perishable property which had died or been used in common by the family long since.

3. Because his honor erred in not holding that all claims for an accounting by W. A. McFall were barred by the statute of limitations under the answer and proof herein.

From the views heretofore announced by us in this opinion, it

will be seen that it is unnecessary to notice the first ground of appeal herein.

As to the second ground of appeal. We cannot hold that the Circuit Judge was in error in requiring the estate of W. A. McFall to account for the personal property of Rachel McFall that went into his hands in 1871. It is true that what has already been turned over to the administrator, John McFall, need not be accounted for again; but the estate of W. A. McFall must show what was received in 1871, and what became of the same. Any plantation or family supplies that were on hand in 1871 must be accounted for. There is no testimony of a gift of these by Rachel McFall. This liability to account must be made under just requirements, however. When horses, or mules, or cows, or sheep, or hogs died, the estate of W. A. McFall must be excused therefor. Or when Mrs. Rachel McFall gave them away, as was done of a cow to James T. McFall about the first of the year 1871, no account must be required of such property so disposed of by Mrs. Rachel McFall. With these limitations or explanations of the accounting to be had as to this personal property, we sustain the Circuit Judge on this point.

As to the third ground of appeal. We do not find any error in the Circuit Judge when he refuses to allow the plea of the statute of limitations as to the accountability of W. A. McFall's estate for any claims against it. Of course, there is no necessity for such a plea to protect such estate from any accounting as to the rents and profits from 1871 to 1889 inclusive, for we have decided there was no liability in such matters. But as to any personal property that went into his hands in 1871, the statute is no bar, for there was no change in the relation of W. A. McFall to his mother as to this property from first to last; he was a trustee, so to speak, as to this personal property, and he must account for it as the judge has held, under the limitations or explanations thereof as we have herein fixed.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed, with the limitations herein fixed, and that

the case be remanded to the Circuit Court for such further proceedings as may be necessary to carry such judgment into effect.